Our next case is 118984 Patrick Joseph Kearney v. Union Pacific R.R. Co. Are you ready to proceed? May it please the Court. Hugh Griffin on behalf of the defendant appellant, Union Pacific R.R. Co. This case involves a very tragic accident, and it should never have happened. The reason it happened is because two contractors on the job, both with fine reputations, no history of dangerous work practices or shoddy practices or employee injuries, much less conscious risk-taking, on the morning of July 31, 2006, without the knowledge or the presence of Union Pacific, made a conscious, deliberate choice, unpredictably, uncharacteristically, to take a big, big risk. Who were these contractors? One was HAPS, Inc., run by Mr. Steve HAPS. HAPS had 20, 25 years' experience successful removing jobs for the UP. The deal was he would ultimately sell all the steel that was involved in this subdivision project. There were 18 bridges involved. He was going to take out the three bridges that were abandoned and unused. The rest of the bridges were going to be taken out by other contractors working with UP because they were mainline bridges that actually affected train service. These bridges were abandoned and hadn't been used in years. Now, HAPS said that, on his resume, he said he removes bridges, and he testified that he will remove a bridge if it's supported by trestle or wood. But when it comes to bridges like this, a steel through girder bridge, he always hires his longtime friend, Pat Kearney. And Pat Kearney had decades of experience working for his father, working for his own company. He'd received taking out railroad bridges way more complicated and bigger than this one, received many accolades, awards, safety commendations, et cetera. And so what was the risk they decided to take? What happened? Well, there's two girders, and then between the two girders, there's about 40 beams connected. And then there's a metal floor plate that runs the whole length of the bridge. And what they did was three or four days before this happened, they started to cut away the floor plate and the beams. They work from the middle, and they go out to the end. When they got all done, they had three girders on the south side, three girders on the north side, and a remnant of the floor plate also on the north side, still connected to both girders. Then they brought in a crane, and the crane was hooked up to the east girder. And the plan was, now we're going to cut away the beams that are attached to the east girder, and then we're going to lift the east girder by the crane. Well, the crane operator, in his own words, got agitated about the whole thing because he said, you're not supporting the west girder. I'm on the east girder. You've got the west girder. Now it's going to be bottom-weighted by these beams that are still there. That's not going to work. You've got to do something to secure the west girder. Kearney, for reasons we're not sure, happened. There was some talk about they were in a hurry. They wanted to get both bridges done in one day. They didn't want to pay a lot of money to the crane operator. They didn't do it. So they started to cut, and they started on the south side, and they cut away the beams. They got down to the north side, and they cut those beams away. And then they went to try to lift. And the north end wouldn't come up. And what happened is, even though they cut away the beam and left some space, it pinched in. The beam pinched in because the west wall now was starting to tilt. And Kearney went down, allegedly talked to Haps about it, said something isn't right. It doesn't seem like it's right. He knew at that point. He went back up on top, and he knew what he faced. He knew he had a real risk that that west girder was going to come crashing down. So what did he do? He had a welder down there, right there. He said, look, I'm going to measure the height of the west girder to show you that if it does fall, and that's my concern, if it does fall, it's going to miss you. And he measured it. And then he told everybody to get back. And even Steve Hap, who was down on the ground, yelled up at Jeff, who was his nephew, get back. Because by this time, they all knew the risk they faced. Unfortunately, when that last beam was cut again, in the process of that, it just snapped, and that whole west girder, as they were all concerned, it was going to do, crash. Now, the measurement was okay. It didn't hit the welder. But unfortunately, a plaintiff's son had come out to the job. He had worked on stringing the crane cables to the east girder. Then he was supposed to hold the tagline, and then they lifted it. When it didn't come up, he went up on top, and he offered his dad some suggestions as to what might be wrong. And his dad said, no, that's not it. Get back. But he didn't really explain to his son the west wall issue. The son did step back, but he was on a plate. Remember, we had the north end, the beams, and then there was a floor plate that continued past the end of the north end. Now, the plaintiff said it was not visible at that point. It was under the ground or under some rope. But it was attached to that west girder. So when that west girder crashed, it uprooted the plate, and that's when the plaintiff couldn't get away, couldn't run away, and slipped under, and it came down on his lower legs. Now, ultimately and justifiably, Carty and Hamps paid for their conscious risk taking. Carty paid substantial workers' compensation. Hamps paid a substantial common law settlement. And so the issue before the court today is whether Union Pacific is also viable under the three sections of the restatement that the plaintiff is relying on, 414, 343, and 411. Ms. Griffin, you've laid out some of the facts, and there are a great many facts in this case. You laid out some of the facts in this case. My question to you here today is are there legal issues involved in this case, or is this a case where there is merely an application of subtle legal principles to the facts of this case? Well, we believe there are all questions of law presented under each section. And I don't mean that in the sense of the standard of summary judgment. I mean, either we understand the standards of summary judgment are well established, but are there any other legal issues that have been unresolved that this court needs to answer, or is this merely an application of subtle law to these facts? Well, and again, we thank you for taking the case. This court's never looked at 414 or 411. It has looked, I think, at 343. So we're coming to you with a proposition. And there's been a ton of appellate court cases since the Structural Work Act was repealed in 1995. This 414 now becomes the vehicle by which people bring these construction suits. And I guess it's fair to say not all the law has been consistent, but I think we've got some general principles. But that's why we're thankful that we could bring this case to you today. But I don't know if you're going to solve the whole legal issue today, because this case, I mean, 414 is an exception to the general rule that if you hire an independent contractor, you're not liable for their negligence. Now, the cases that have gone against the defendant, and the ones that are cited in Mr. Rassak's brief, almost all of them are cases where, and it's usually a general contractor, contractually agreed to supervise the job or to at least be responsible for some part of the job or some safety obligations, and then, in all of those cases, undertook a pervasive, boots on the ground, if you will, supervisory activities on the job site so that, and this is the final element of 414, there was ample evidence to find that by their pervasive supervisory activities, they knew or should have known of the dangerous condition in time to prevent the accident. This is the opposite of that case. If Union Pacific had a duty to require HAPS to submit a detailed plan before beginning the work, from which source, then, does that duty arise? Does the restatement of torts, section 414, impose such a duty? No. There's no, I mean, that's basically what Plinyk is arguing, that there's somehow, you didn't, I mean, this is the upside down 414. The argument is you didn't supervise the work. You didn't do anything to supervise the job. And so what we're really facing, the legal issue we're facing is, is there some duty? It's certainly not in 414. I mean, that would mean you'd be liable every time you hired an independent contractor. Now, the argument that Plinyk makes as to why we had a duty, maybe what you're addressing here, is in 2004, before, two years before this ever happened, we hired an engineer to prepare drawings for the whole Rockville subdivision, all 18 bridges. And he listed some general requirements in there. One of them was that the contractor shall submit a sequencing plan of operations prior to starting the work. Now, again, this is just testimony by Mr. Rizma. It's in the supplemental record. He's the Bowman and Barrett guy. He says, well, yeah, but we prepared that for our client. But now that's not in any contract yet. That's not binding anybody. And so what the railroad said was, that's in there because we've got 15 bridges that aren't going to affect the mainline traffic. And when we enter into contracts for those bridges, we need to have a sequencing plan to tell our people when they can't run the trains and when they can't. They didn't put it into the purchase and removal agreement with HABS because he was working on three abandoned bridges that weren't going to have any effect on moving trains. He wasn't even going to need a flagger because this bridge was not even within 25 feet of an operating track. So it's not in the contract. I want to get back to Justice Tice's question. I'm just looking at a little summary of what we're bound to hear from plaintiffs. And without even going into a lot of that summary, just a few things. The plain language in the agreement it issued placed site control in UP's hands. UP retained the ultimate contractual control. The facts show that UP had a right to obtain and should have required HABS to obtain pre-work approval of his demolition plan. Fact upon fact upon fact upon fact. Now, I know you contest all that. And the circuit court found that there was a question of fact whether the defendant hired an incompetent contractor. Back to her question. Are there issues of law here? Well, this case, I think you even said we're not going to solve everything here. Isn't it true that these type of cases hinge on their facts when there's summary judgment? I mean, will this be precedential to other cases in this area? Certainly it will be. I mean, the kind of contract provisions that he's talking about, that we have a right to inspect the work, to stop the work, to change the work, those are common provisions in most every contract. And comment C of 414 deals with that. And it says that's not the kind of control we're talking about here to impose liability. The duty to get a sequencing plan, I hope I've explained it, that wasn't part of this contract. I take you to your case in Thompson v. Gordon, unanimous decision. And kind of the same argument was made there. The engineers came in to resurface a bridge. And I guess Plaintiff had an expert who said, well, any knowledgeable engineer would have put a higher median strip in it. And he looked at the contract and said, well, there's no requirement for that. That's not going to establish a duty. Maybe they could have done it. Maybe they could have done this, but where's the duty? And there's all those facts that he's saying under the facts of this case. And, again, these are not uncommon contract provisions, giving an owner those kinds of general rights. But this all supervision, the contract delegated all supervision to Hatch. So it wasn't like we retained a right to supervise the work. We retained the right to look at the work, see if it was satisfactory and so forth. But that isn't the kind of control that the cases have recognized. And, again, there's a whole separate negligence element, the 414, in the cases we cited in the brief that said, you know, even if you've got an argument about control, you've still got to show that the defendant knew or should have known about that dangerous condition in time to do something about it. And there's just no evidence of that here. He argues that another one of his arguments is that we came out after the accident and we said, look, we don't want another accident on our property. And so we suggested to Hatch, here's one way you can secure the West Girder. Now, as it turned out, he hired somebody else and did it a whole different way. But I'm sure the principle of law here can't be that if you come out, if I come home and I'm having a roof put on, and I find out somebody fell off the roof and got hurt, well, I'm going to go to the roof and say, well, what happened? Well, our ladder was too short. It was like three feet short, and the guy jumped down and tried to make it, and he fell off and got hurt pretty bad. Well, I'm going to say, hey, tomorrow you're going to bring a different ladder, right? Of course. I mean, the law can't be that if you make a safety suggestion after an accident, that makes you retroactively liable for an accident that already happened. And that principle isn't in any case, but that's really the principle that there are. So that's 414.  Any dispute in the facts you want to come up with isn't going to get you to the duty. That's a fundamental issue of all our tort law. Could you have done something? Maybe you could. I think Justice Tice in the Ross case, which was a 414 case, you wrote about this. There was a violation of OSHA by the defendant, and you said, well, so that's not enough to establish negligence. If he wasn't that involved in the job, if he wasn't supervising the job sufficient to trigger duties under 414, something he did like that, that's not enough. You can always, after an accident, think about, gee, I could have done something. Maybe he could have done something. But without the duty, there's just no liability. I have a question about the premises liability idea, dangerous condition on the land. I'm going there next. Who owns this land? I'm sorry? Who owns the land? You do. You do. So there was a sale of the bridge, but not the land. Right. Let me deal with it. I hope I can deal with it. I need to get the 411. 343 should be, I think, a slam dunk. He's arguing that the plate that P.J. was standing on is the dangerous condition. And what 343 says is you know or should have known of an unreasonable risk of harm before the accident and you didn't do anything. Well, that plate had been sitting there as safe as could be for 100 years. The bridge was 100 years old. It was going to be as safe that day as it was the prior 100 years until Carney and Hamps decided to take the risk they took and have that west wall come down. The only reason the plate moved, it was attached to the west wall. So I've got to get the 411. Negative hiring of an incompetent contractor. Our lower court, our circuit court, followed the majority of cases in the country that have looked at the language of 411 and said it talks about third persons. We don't believe that includes a worksite employee, an employee of the independent contractor. There's a lot of reasons given for that. Availability of worker comp. Don't want to discourage people from using independent contractors. It's true, it's not vicarious liability, but it's not like 414 where you're implicated in actually the on-the-job negligence. And Justice Tice, again, if I could refer you to your Apostle case, Apostle v. Oliveri, you looked at 413, which a lot of the cases in the other states have kind of analyzed both sections together. You didn't have 411, you had 413, which had the exact same fact pattern we had, an owner sued by a subcontractor's employee. And you concluded, as a lot of the states concluded, that that statute only applies to passersby or joint employees. And we believe that that's true. But I want to put that issue aside. And you're right, the Circuit Court, Justice Thomas, ruled against us on the issue of our negligence in determining whether there was a competent contractor. But they looked at it. The argument is still, it's only looking at halves. I mean, UP, the testimony of UP was we assume somebody bids on a job. Either they know how to do it, or they're going to go out and hire an expert. And that's exactly what happened to H. Carney. Decades of experience demolishing railroad bridges for his father. They used a crane a lot back then. They used dynamite also. But there was testimony, it's almost the same thing. You cut away the floor plates, you cut away the beams, and then instead of a final cut by hand, you put dynamite in there. So I think I use the term negligence in the air in my brief. I think that's what it is. If, in fact, we had looked further, as they're arguing we should have done, we would have found Carney. We would have found a hard Carney. No one claims that a reasonable man would conclude that Carney didn't have the knowledge, skill, and experience to do the bridge demolition work. That's the test right out of 411. So, again, I think that that's an independent ground for affirming that 411. There's one more, if I can sneak it in. 411 doesn't apply unless there's some deficiency in the contractor's skill or experience that you should have found that caused the accident. And that brings me back to where I started. At the end, this wasn't because Haps or Carney didn't know the risk. They knew it. And yet they decided to take it, unfortunately. And, again, that's – and there was nothing, again, in their history to show that they would be that kind of an actor. And so that's a separate reason they're coming B to 411, that the summary judgment under 411 should be true. Thank you. Thank you. Good morning, Your Honors. My name is Michael Racek. I'm here on behalf of the plaintiff's affilee, P.J. Carney. Just to diverge from where I was going to head, when I prepared for argument, one of the thoughts I had in mind is, is there some general rule I can ask this court to derive from the many facts before it? And the answer was I could not come up with a general rule. The problem is that the case – each issue in the case involves an incredible number of facts. The Railroad's counsel has given you some of them. My brief has the other side of many of those facts, and it's those facts that determine the outcome of the case. That's why I presented the preliminary section of my brief, suggesting that review has actually been improvidently granted. I want to start just first by looking at a theme that resonated in the brief and also this morning, and that's how can we blame the railroad because they hired HAP, and even if HAP wasn't any good, they hired a very good expert. And there's two things wrong with that. First, the evidence was that the railroad did not rely upon HAP hiring an expert in this area. I think, as Mr. Benbow said, somebody named Carney signed in. I didn't even know who Carney was. More particularly, Mr. Carney's expertise is demolishing bridges with explosives. I mentioned in my brief the entire resume of Mr. Carney that the railroad put in to show that he was an expert in demolishing bridges all have to do with explosives. Mr. Carney doesn't do anything with cranes. More to the point, Mr. Carney wasn't there to take this bridge down. If your honors recall, Mr. Carney's testimony is, I did not have a contract with Mr. HAP and his company. All that happened was that I wanted to do it my way. Mr. HAP insisted, no, I'm going to get a crane and do it my way. But HAP said to Carney, I'd like to use two of your employees, and basically he loaned them or in some way let HAP use two of his employees. Missing in that whole picture is P.J. Carney, you might have noticed. That's because not only was Carney not a subcontractor technically on this job, thus dropping him out of the restrictions on Section 4.4, even if you adopt some states' rules that 4.11 does not apply to employees of a subcontractor, Carney is not that subcontractor because he wasn't the contractor. And if we look to the employee, P.J. Carney, he wasn't anything. He wasn't a second party, a third party, maybe a fourth party in that chain of command. And he showed up, if you recall, simply because his father said, would you come here and do one thing for us? We need somebody young and strong. We're basically a bunch of fat old men, and we can't get up there and tie that cable on to that girder. Could you help me with understanding how Carney could be both a bystander for purposes of liability for 4.11 and also be an employee for the purposes of collecting workers' comp? Yes, sir. Thank you. The distinction is that, first, I have no complaint that they paid his workers' comp, and I presume that he was paid workers' comp coverage because he was in the scope and course of his employment in the sense that his father, who he worked for on occasion doing this, told him to come out and do it. But he is akin to the person who is sent to another job site and does the work there and then returns to his home. If that's not his normal work site, if I'm sent to Decatur to do a job, I'm actually covered on my way to and from Decatur, and that's the Cox case I cited to the court, so that I am able to have workers' compensation coverage because of the peculiarities of workers' compensation law. But at the time, I'm not working. I'm done. Basically, P.J., under some of the testimony, was simply waiting to go home. He'd finished his job. You have to help me with that. He's not a traveling employee. I'm sorry? He's not a traveling employee. He comes to the site. He does some things. He's waiting there. He hasn't left. He then files a workers' comp claim. Obviously, he can only receive that if, in fact, his injury arose out of the course of his employment. That's correct. So, again, I'm going to ask you to kind of make a more fine-tuned argument in relation to Justice Freeman's question. Because under workers' comp law, you're deemed – it's like a non-delegable duty, I guess is the closest analogy. You're deemed to be in the course of your employment, even though you're not working at the moment, and that's what he was doing there. He was in the course of his employment for workers' comp, but he wasn't working at this point. He was done. He could have simply – maybe the best analogy I get, what if PJ, instead of coming back up on top, had instead simply been standing downstairs, down below, waiting for his mother to come back and pick him up? And when this plate fell, something also fell and injured him. I think then you can see even more clearly. He's still covered by workers' comp because he's still under the specific workers' comp cases, like Cox. He's still within the scope and course of his employment, even though he's done. And if you look for the – if you look behind the purposes to the restatement, 414 and 411, they're looking to protect people on the job site. Would that still be the analysis if he was on his lunch break? No, because then he would be in a continued course of his employment. If I'm at the factory and I'm on my lunch break and I'm on the factory grounds, I'm still covered. I'm trying to think in my experience of workers' comp, if I could ever think of anybody who's ever argued that if I have an eight-hour shift, if I leave the job for my lunch break and I go down to a diner, I'm not covered. But that's my own choice. If I do something like that here, the choice is not here. Suppose he said, I mean, he's taking his lunch break and this tragedy occurs. Wouldn't he still be covered under workers' comp? If I was the workers' comp carrier at that point, it becomes a very close case of workers' comp, frankly, whether at that point he would be covered, assuming he was done with his job and had decided to remain on the site. I'm not sure there's a workers' comp case that's diced at that point, frankly. But the suggestion here, though, is he was done. The railroad said, no, he was using a tagline that Toby, the welder, said he was using a tagline. That shows he had a bigger role here. That's going to be for a jury because Toby is the welder. Toby is up on top. P.J. Carney is down below. If Patrick Carney could not see his son down below, then it follows that Toby, who's a welder and is down on the ground, could not see him down below. And that occurred an hour earlier. There was no evidence that he was holding a tagline or doing anything. P.J. has no testimony. I was standing there. That's all I was doing. So if he was in the course of his employment, which he must have argued when he applied for workers' comp, why would Union Pacific have a duty to him in terms of negligent hiring? Because he does not have a relationship with Union Pacific. Because Union Pacific under Section 411, under the cases that are most adverse to me, the cases most adverse to our side say that somebody like Union Pacific does not owe a duty to the incompetent contractor's employee because that person is probably going to get workers' compensation coverage. That's the difference between this case and Apostle. In Apostle, the injured worker was injured by his co-employee. And the courts have apparently reasoned that when you have a duty under 411, they've likened it, I think, wrongly to vicarious liability. And basically they put somebody like UP in the shoes of the employer. Well, here, first, that's wrong. Even Camargo in California said it's not vicarious liability. And then they switched and said it was. Restatement 3rd, which I mentioned in a motion I filed with the court, the introduction to Restatement 3rd makes clear these are direct liabilities. Even the railroad admits 411 is a direct liability scenario. So you have a situation where you have a direct liability to somebody who is not an employee. If you're not an employee of the incompetent contractor, you're a third party, I believe would be the logic. And therefore, even though if that person gets workers' compensation, that did not change UP's duty. I mean, the question would be, would UP have some different duty to two people standing there, P.J. Kearney and somebody who was undoubtedly simply who walked up and looked at the job site. Would it be different if he was an employee of HAPS? If he was an employee of HAPS, then I would have to persuade the court that the ruling in Apostle, even though it did not address, Apostle did not address 414. It addressed 413, Apostle did not address 411, it addressed 413. 413 has frequently been interpreted to be vicarious. 411 is direct. But the cases have said that if you're an employee of the incompetent contractor, Camargo and the other cases they've cited, you're not a third party. The question is how you define third party. Why is it any different? I mean, what is the policy reason, if duty is a policy? If it's been recognized that the employee of the contractor, the landowner does not have a duty running to them for the negligent hiring, why is it any different for the employee of the subcontractor? I think for two reasons, if I can explicate them. One argument was that the duty, I'm sorry. One argument is that if I am the employee of the incompetent contractor or under 413 the contractor is taking risks, I understand, I'm best suited to understand what's going on. So for that reason, the courts have said we're not going to hold this higher level person responsible. That's not P.J. Carney here, because he's not employed by HAPS. He doesn't know that HAPS is incompetent. He doesn't even know who HAPS is. He had no idea. And the other reason that they gave was that somehow when the UP hires HAP and pays HAP, HAP took into consideration when it sent the bill up, when it agreed to pay UP. It's so backwards, because it's not usually how you would do this. Instead of UP paying HAPS, you have HAPS paying UP for the privileges doing this, because they're going to profit by the steal. In an ordinary case, HAPS would take into account and UP would take into account the cost of workers' compensation. And somehow because they took into account workers' compensation, that condenses UP and HAPS and everybody below. But workers' compensation couldn't have been taken into account by anybody here, because P.J. wasn't working for any of them, and his participation at the site wasn't even anticipated. Nobody could have taken P.J. Carney's charge for workers' compensation into consideration. If that's the factor that Camargo and the other cases relied upon, that's not a justifiable factor. That's about the best I can say it. I get more confused. But I can point to the court to cases like Seavers in Alaska and Bagley in Indiana, which have no problem with that. They basically said RASAC's right. And interesting enough, in the Hoffman case, which the railroad added information on in its reply brief, if the court looks at Hoffman, Hoffman said the restatement really doesn't tell us. It doesn't define third person, which is the key to applying 411. Hoffman said it's up to each state to decide. If I can step back a step. And I'm more than happy to try and re-answer that question, but that's about the best I could do with it. To step back a step. As to section 414, you heard some of the facts, but the facts on the other side would show that the railroad in fact did have a duty here, regardless of who P.J. Carney worked for, because HAP said that they made him check in every day and that they would check his job, because there's paragraph two of the plans, and the testimony from one witness was that the plans were in fact available to HAP. He didn't look at them, but they were available. And I believe it's Mr. Meyer from the railroad who said, yes, that paragraph two in all those plans, they apply, they clearly apply, they apply to this job, he couldn't have said it any more time. And the railroad's ability, my opposing counsel said, well, how could HAP be obligated? The answer to that is, within those plans which were made available to HAP, was this requirement that HAP produce a step-by-step sequencing so that the railroad could see if he was doing his work safely. Meyer said that that was a requirement of the plan, and I would like the court just to keep in mind that the contract, going back to the contract, gave the railroad not just the discretion, and contrary to my opposing counsel, I do read my cases and their cases, it gave them the sole discretion to terminate, not to stop the work, but terminate this contract. There isn't any other case that I've seen that gives a party that particular right. That's a right that goes way beyond anything in the comments to 414, the right, the sole discretionary right to terminate the contract if you're not happy. That means that the railroad could have said, you never gave us the plan, and if HAP said, I'm not going to, they were within their rights to terminate. And they would have, as a matter of fact, Mr. Meyer said, if you don't have a plan, we will not let you work. That's the testimony. Ergo, the railroad had the right to do it and did not follow through on that, even though they depended on that right. The final point, of course, is the post-accident control. Obviously, I take issue with how the description was given to the court. The railroad came storming in after the accident and said, you're not going to do that again. This bridge was pretty much completed by OSHA, but it wasn't just this bridge. It's a whole project. The next bridge was done by somebody else, and my brief contains the comments mostly by our expert witness who points out that it was the UP that caused it. The UP first gave HAP a recipe how to do it, and if he didn't do it, what the UP did was cause HAP to go hire somebody else and pay him. It wasn't as if HAP did it voluntarily. I don't see how there could be any more suggestion of control. It's more control than they showed in Wilkerson. I don't ever want to see that happening again. Here they made him do it a different way. Unless the court has further questions, I would rely on my brief for any of the other explanations, especially the explanation of Apostle Camargo in 411. Thank you. May it please the court. I never got to Mr. Meyer, so I'm glad counsel brought him up. He was a retired bridge designer from Omaha, and he was being examined by John Pappin, a very skilled plaintiff's lawyer. And he had these plans and specs that we've talked about, and he put them in front of Meyer. And the substance of it was, well, if this applies, shouldn't he have turned in a sequencing plan? And finally Meyer said, well, yeah, if that applies, he should have. But it didn't apply. It wasn't in the agreement. Meyer said, I never saw the purchase and removal agreement. He says, by the way, I never even got involved in another one. I don't know what they contain. And so counsel says that in his brief. He said, well, that was a technical truth. It wasn't in the agreement. It wasn't in their contract. But it's a legal truth. It's a legal binding truth. And again, I go back to Thompson v. Gordon. I mean, the contracts, that's the duties. And again, UP wanted that sequencing reference in there because there was 15 other bridges where contractors might get involved, and that was going to affect our train operation. We've got to see their sequencing before we let them go to work. But it didn't apply here. In my reply brief, I tried to give up, if you will, all the facts of the disputes. I tried to show where I thought counsel was wrong, and then I tried to give it up. And I still, to your question, Justice Tice, I think the legal issues there, no matter which way you go with the facts, as counsel wants them to be. Hap said, hey, I got to talking to this guy from DMD. I knew Kearney wasn't coming back, so I told this guy, hey, can you help me out at Lexington? And he says, well, UP went in there and took over and put DMD in there. But what if that had happened? Yeah, to our satisfaction, what if we had walked in there after this accident and said, hey, you know what? We're getting another contractor to do Lexington. I mean, did they have that right? Maybe they did. But the fact is, that wouldn't make them liable for an accident that already happened where they didn't exercise any supervision, where they weren't obligated to exercise any supervision. It wouldn't relate back and make them liable for what happened at Polk Street. As far as the employment issue, we cited the Estoppo cases. I think they apply here. I mean, there's all kinds of pleadings in this case and in the workers' comp case, which is in the record, in which Kearney alleges that he was a Kearney employee at the time of the accident. So I think that's a given. And again, he says, Mr. Rasek, my good friend, that your case in Apostle didn't have this fact. It did not have 411, but the factual scenario was a subcontractor's employee claiming against the owner. So I would respectfully submit that the rationale there is equally applicable here. Believe it or not, I guess the only other point I had was he said, well, Kearney, he's a blaster. The inference was this was a crane operation. I kind of touched on this, but in A559, Kearney testified that he did work with his dad for years where they did it by crane. And again, the testimony of the Kearney workers was there isn't much difference. You take out the floor, you take out the beams, and instead of making that final cut by hand, you use an explosive. There's no argument by their expert, there's nothing in their brief that somebody would look at this job and say, well, they hired Kearney, but he's not confident to take down this bridge. There's just no evidence of that. So that's back to my negligence in the air. Had they looked further, which is what they said we should have done, we'd have found Kearney. Nobody can claim that we would have then concluded, a reasonable man would conclude that Kearney wasn't confident to take down the bridge. And so I believe that's a separate ground, no matter how the employee issue shakes out. And I believe it should shake out just the way the circuit court ruled. But that's a separate ground to affirm the summary judgment on 411. So I think I got it all in. If there's any further questions, we would ask the court to reverse the appellate court and to affirm the summary judgment below. Thank you. Case number 1189A4, Patrick Joseph Kearney v. Union Pacific Railroad Company, etc. Will be taken under advisement as agenda number seven. And Mr. Griffin and Mr. Rathsack, we thank you for your arguments this morning and your excuse at this time. Marshal, the Supreme Court stands adjourned until 9 a.m. tomorrow morning.